Rockingham
No. 78-197

GERALD C. STARKESON

v.

MARSHA S. STARKESON

February 14, 1979

*Fryer, Boutin & Marshall,* of Londonderry (*Robert H. Fryer* orally), for the plaintiff.

*O'Neill, Backus & Spielman,* of Manchester (*William L. Shaine* orally), for the defendant.

GRIMES, J.   The issue before us in this divorce case is whether the trial court abused its discretion in awarding custody of a minor child, then age four-and-a-half years, to the mother. We find no abuse of discretion.

In September 1976, after an informal separation of approximately nine months, the plaintiff filed this libel for divorce. The defendant entered a cross-libel, and both parties requested custody of their minor child, Ellen Rebecca, who had been living with the defendant in the marital home during the separation. The parties stipulated to all matters except custody. After a hearing in October 1976, the Master (*Henry P. Sullivan*, Esq.) awarded temporary custody to the defendant and ordered the probation department to prepare a report for a later determination of permanent custody. In November 1977, a hearing on permanent custody was held before the same master who recommended that custody be finally awarded to the defendant, with liberal visitation rights in the plaintiff. The Superior Court (*Bean*, J.) entered a decree in accordance with the recommendation, and transferred plaintiff's exceptions.

Plaintiff has devoted a large portion of his brief and oral argument to the question of sexual prejudice. RSA 458:16 and :17 (Supp. 1977) provide that in awarding custody, "no preference shall be given to either party . . . because of the parent's sex." In fact, before the temporary hearing, plaintiff filed a memorandum calling to the attention of the master the existence of the statutory prohibition. Plaintiff argues that because the evidence was so overwhelmingly in his favor, the award to the defendant must have been based on a subconscious preference in the mother's favor.

We will not presume that trial judges and masters will ignore the statutory prohibition contained in RSA 458:16 and :17 (Supp. 1977). Nor do we find on review of the record that the evidence is so overwhelmingly in favor of the plaintiff as to support a finding that the master in this case violated the prohibition. The main complaint against the defendant was that at the time of the temporary hearing she kept eighteen cats in the house, that the house smelled of cat excrement and urine which were on the floors, and that she did not keep the home clean. Defendant admitted to not being a neat housekeeper, but denied that the house was dirty except during the period when there were several kittens in the house. It was findable that she had reduced the number of cats to six at the time of trial and that the house was reasonably clean. Moreover, the master refused to grant plaintiff's request for a finding that the condition of the defendant's

house constituted a health hazard or that it threatened to affect adversely the health, safety, or comfort of the child.

At the time of these proceedings both parents worked, and Ellen was cared for during the day by the babysitter that had cared for her over the prior four years. The babysitter was chosen by both parents, and she appears to be well qualified, having had extensive experience with young children during her four years in the public school system as a teacher's aid and her two years in the Headstart program in a similar position. The defendant testified that her method of raising Ellen was aimed at making the child self-reliant and self-confident. She testified "I do not want an over-protective [sic] child." The babysitter testified that the defendant was good for the child because she treated her as a person. The babysitter also stated that Ellen did not seem to regress after being with the mother, but that she sometimes was "kind of childish, I mean infantile" after being with the father. Moreover, the babysitter stated that the child was neat, clean, and well-dressed when delivered to her by the defendant. The plaintiff agrees that Ellen is clean and well-dressed when he picks her up for visits. Finally, the evidence shows, and the plaintiff concedes, that Ellen is self-reliant, well-adjusted, outgoing, happy, and healthy. She is currently spending a part of each day in a Derry nursery school chosen by the defendant.

Plaintiff has been described as an "over meticulous" person. He has a girlfriend who is divorced and has two young children, seven and four years old at the time of trial. She lives in Nashua and she and plaintiff plan ultimately to marry sometime after the divorce. If plaintiff obtained custody of Ellen, she would stay with his girlfriend instead of with the present babysitter with whom she has stayed weekdays since she was only a few months old and with whom she has probably spent as much time as with either parent. Plaintiff's plans are to move the child from the present nursery school to the Temple Beth Abraham School in Nashua, where she would attend three mornings a week. There is no dispute but that both parents love the child.

It would serve no useful purpose to review in any greater detail the evidence in the case. The master heard the testimony and saw the parties. This is important. The evidence in custody disputes is seldom all one way, and it must fall upon the trial court to make the decision on the evidence. It is not for us to make the determination in custody matters, but rather to decide whether the determination made by the trial court can be upheld.

■■ We repeat what we have so often said, that we will not disturb a trial court's or a master's determination if it could reasonably be

made. *Ballou v. Ballou*, 118 N.H. 463, 387 A.2d 1169 (1978). We cannot say on the record before us that there was an abuse of discretion on the part of either the master or the trial court, or that their respective determinations could not reasonably be made on the evidence. Both the stability of having the same babysitter that the child has been with almost all of her life and the defendant's method of child-rearing designed to develop independence and self-reliance in the child furnish sufficient bases for choosing the defendant over the plaintiff as custodian in this case.

A dissent speaks to "joint custody." We do not oppose such a solution if the trial court in a proper case should choose it. However, we reject the suggestion of a presumption in favor of it and we can by no means say that joint custody in this case is compelled. The liberal visitation rights given the plaintiff in this case, which considering the fact that both parents work and that the child is either with a babysitter or in school five days a week, give the plaintiff almost as much free time with the child as the defendant has. The plaintiff is not, therefore, in the words of the dissent "just an every-other Saturday father." He has the child two weekends a month beginning at 5 p.m. on Friday until 6 p.m. on Sunday and extended until Monday on holiday weekends. He has her three weeks during the summer and every Tuesday evening. Arrangements are also provided for Christmas, Thanksgiving and other holidays.

It can hardly be said that Ellen can view her father as having abandoned her or that she is being deprived of the opportunity to "develop full relationships with both parents." Although joint custody in this case might prove satisfactory, we repeat that it is by no means compelled.

*Exceptions overruled.*

DOUGLAS and BROCK, JJ., dissented; the others concurred.

DOUGLAS, J., dissenting: I cannot agree with the majority's position that the master followed the statutory mandate of RSA 458:16 and :17 (Supp. 1977) in awarding custody to the defendant in this case. The master specifically found that both parents give the child proper care and attention and provide attractive homes for her. They both love the child and wish to take care of her. The superior court should have considered an award of joint custody, because there is no reason to deprive either parent of legal custody on these facts.

At common law, the father was entitled to custody in divorce cases because children were considered the property of the father. Jones,

*The Tender Years Doctrine: Survey and Analysis,* 16 J. FAM. L. 695, 696 (1977–78). By 1900, many States had modified the common law rule by statute. Roth, *The Tender Years Presumption in Child Custody Disputes,* 15 J. FAM. L. 423, 429 (1976–77). Fathers began to lose their exclusive right to custody when popular psychological literature concerning child development and the maternal role appeared in the early 1900's. The law rapidly evolved into a "tender years doctrine," which held that in most cases the mother was more fit than the father to receive custody. Jones, *supra* at 695. National statistics indicate that since the 1920's, divorced women have received custody about ninety percent of the time under the theory that such an award was in the best interest of the child. M. Roman, The Disposable Parent, manuscript of lecture presented at the Association of Family Conciliation Courts, Minneapolis, Minnesota, May 11, 1977, at 2 (hereinafter Manuscript). The "tender years doctrine" has eventually led to the identification of the mother's custody with the child's best interest. Until very recently, a father who wished to obtain custody had to prove that the mother was "either an emotional cripple or a moral leper, and, should he wish to maximize his chances, preferably both." *Id.* at 7.

The tender years doctrine developed when industrialization split the labor force into paid labor for men and unpaid home labor for women. *Id.* at 4. The classic contrast between the breadwinner and the bottle-warmer created "an ideology that now victimizes . . . both [sexes]." *Id.* at 5. Viewed from a modern perspective, this theory appears sexist. By capitalizing on the theory that "someone has to take care of the children," society can attempt to "keep women in their place." Women, however, are joining the labor force in ever-increasing numbers. Fifty percent of all women and sixty-seven percent of divorced women are employed. *Id.* at 8. The hand that rocks the cradle is, in short, also punching a time clock. Our family structure is evolving into dual career households where parenting will and should be shared even if the marriage does not remain intact.

This year alone, over one million people will divorce; three-fourths of them will have children. The number of single parent households will swell to over six million. *Id.* In 1975, divorce affected one million American children under the age of eighteen. Baum, *The Best of Both Parents,* N.Y. Times, Oct. 31, 1976 (Magazine) at 45. However, divorce entails reorganization of a family rather than its dissolution. Our current legal customs tend to make ex-parents of fathers, overburden mothers, and deprive children of full emotional support from both parents. The sole parent, usually the mother, must bear tremendous psychic and economic costs, and must fulfill all family functions.

Children cannot provide emotional support to a single parent, for their love is demanding of the parent rather than supportive. The sole parent not only has to fulfill all family functions, but has little release from his or her burden. Thus one parent becomes overburdened and the other, in a sense, underburdened. The father may be leaving his wife and home but should not be leaving his children.

There is solid evidence that most children experience pain when their fathers are absent. *See* J. Wallerstein & J. Kelly, *The Effects of Parental Divorce: The Adolescent Experience,* in THE CHILD IN HIS FAMILY, 479–505 (E. Anthony & C. Koupernik eds., 1974). Children view their father's absence as abandonment, and this may lead to erratic emotional behavior. The children who are free to develop full relationships with both parents fare best after divorce. Joint custody avoids subjecting the child completely to one parent's will, and instead affords the child in-depth exposure to both parents. Although the father in this case was granted adequate visitation rights, fathers unfortunately are often granted very little time with their children, and become "every other Saturday" parents.

Many modern writers strongly recommend joint custody. *See* M. GALBER, CO–PARENTING (1978); M. ROMAN & W. HADDAD, THE DISPOSABLE PARENT (1978).

> There *are* ways to change what is now perfectly clear about divorce—that current custody arrangements often have terrible effects on children. Indeed, as long as custody is an either/or arrangement, the great pain of loss that children *and* fathers suffer and the equally great pressures and anxieties *that the responsible mother must feel will continue to* show up as the damaging, and negative, aftermath of divorce. The terrible pity of it is that it need not be this way.

Manuscript at 16.

It has been argued that joint custody creates an artificial bond between the parents; however, children link their parents forever. One basic objection to joint custody is the fear that it leads to parental conflict and bounces the child back and forth, both physically and emotionally, between the parents. This objection presumes that parents who could not reconcile conflicts while living together are even less likely to resolve conflicts while living apart. Henszey, *Visitation by a Non-Custodial Parent: What is the "Best Interest" Doctrine?* 15 J. FAM. L. 213, 231–32 (1976–77). This argument ignores the fact that parents disagree on child-rearing issues whether or not they are mar-

ried and living in the same household. Professor Roman found that there is no empirical data which shows that parents cannot isolate their marital conflict from their parental responsibilities. "In fact, it is not uncommon for joint custody parents to frankly admit their antipathy toward one another but to maintain, at the same time, that they do not intend to harm their children just because they might like to harm one another."

Manuscript at 19.

Indeed, joint custody may limit disagreements to child-rearing concerns rather than marital problems, which may have become more frequent during marriage because of the daily contact between the mother and father. Baum, *supra* at 45. One commentator has stated that sole custody works best when it is "akin to joint custody in practice. Usually, though, sole custody appears to exacerbate parental conflict and it is often used by the mother as a club, forcing the children to be caught in the middle." Manuscript at 20. Conflict between parents does not cease when custody is awarded to only one parent. Parents may argue about withheld support payments, visitation times, and general child-raising policies. Children may be used as pawns to continue parental disagreement.

An additional objection to joint custody is that children may be torn by loyalty conflicts. This argument ignores the fact that

> loyalty conflicts occur in intact families. And no one assumes that they can't be worked out or that these families ought not to continue functioning as units because such problems exist. To suppose that loyalty conflicts are sui generis to joint custody seems to me to beg the issue. Nor are loyalty conflicts avoided if one parent is given sole custody.

Baum, *supra* at 46. Sole custody is, in fact, "most likely to produce the 'bartered' child, one whose loyalties are divided." Manuscript at 21. Couples who have joint custody of their children can create a satisfactory living arrangement for their children, which may range from their children's primary habitation with one parent to time spent equally with each parent. An award of joint custody does not require that children spend three and one-half days per week with each parent, but allows flexibility in the determination of the child's living situation.

My central objection to the widespread use of sole custody without consideration of joint custody is that sole custody drives the father

away from the family if the mother can say, "I have custody of the children and you do not." It is difficult to believe "that the legal death of one parent, and the complete subordination of the child to the other's possibly distorted view, is a preferable step for the child's future development." Manuscript at 22. Indeed, there is more evidence that it is potentially damaging to the child to be completely subject to one parent's will. *Id.* In most uncontested cases, therefore, it would be better psychologically for the father to be a legal parent as well as a natural parent. Parental involvement should be greater than check-writing and occasional visiting. Of course, if the level of parental conflict is so high that the parents are emotionally unable to assume joint custody, sole custody will still be appropriate. In increasing numbers, however, both parents are competent, working, and desire to care for their children. The consideration of a presumption of joint custody by trial judges and attorneys may further the best interests of children in divorce cases and assure that equality of rights under the law in this State will not be abridged or denied because of sex. N.H. CONST. pt. I, art. 2; RSA 458:16, :17 (Supp. 1977). Accordingly, I would remand this case to the superior court for consideration of an award of joint custody.

BROCK, J. dissenting: As the majority points out, "we do not presume that trial judges and masters will ignore" the statutory mandate contained in RSA 458:16–17 (Supp. 1977). Given the long history of preference for child custody with the mother, however, and the virtually impossible burden of proving or disproving whether so subtle a prejudice or preference is at work, we cannot presume that they will not. Without succumbing to the temptation to characterize or pass judgment upon the lifestyle of either parent in this matter, I would hold that the master's determination, on the evidence before him, that an award of custody to the defendant is "most conducive to [the] benefit" of the child could not reasonably be made.